Wendy S. LANG, formerly Wendy
S. Meske, Appellee,

v.

Robert H. MESKE, Appellant.

Superior Court of Pennsylvania.

Submitted April 5, 2004.
Filed May 14, 2004.

Andrew W. Young, Doylestown, for appellant.

Judith A. Algeo, Doylestown, for appellee.

Before: DEL SOLE, P.J., GANTMAN and OLSZEWSKI, JJ.

OPINION BY OLSZEWSKI, J.

¶ 1 Robert Meske (appellant) appeals from the order of the Court of Common Pleas of Bucks County (Goldberg, J.) requiring him to pay $86,679.88 to his former wife, Wendy Lang (appellee). Meske argues that the lower court incorrectly interpreted paragraph 16(c) of the property settlement agreement between him and Lang. We affirm.

¶ 2 After approximately sixteen years of marriage, Meske and Lang obtained a divorce. Pursuant to the divorce, they executed a property settlement agreement on December 15, 2000. This agreement dealt with the distribution and division of various marital assets. One of the assets to be divided was a retirement savings account.

C. The parties acknowledge that they have a United Technologies Co. (UTC) Employee Saving Retirement Plan. The said account has a balance of $214,873.96 as of June 30, 2000. The parties hereby agree that Husband [Meske] shall receive, as his sole and separate property Sixty Percent (60%) of said account, and Wife [Lang] shall receive, as her sole and separate property Forty Percent (40%) of said account. Each party waives any right, title, or interest whatsoever they may have in and to the monies distributed to the other party. The account shall be valued as of December 31, 2000 less any contributions made by Husband after July 15, 2000.

D. Wife's portion of the said UTC 401(k) account shall be reduced by the following:

1) One-half of the difference of the value of the assets distributed in Paragraph 16(A) and 16(B) of this Agreement, to wit: $6,005.72.

2) The balance of the loan outstanding against the United Technologies Company Employee Savings Retirement Plan plus the payments deducted from Husband's pay since July 15, 2000.

3) The sum of $20,000.00 as compensation for Husband relinquishing his claims and ownership in the marital home at 506 Waltham Lane.

Property Settlement Agreement ¶¶ 16(C) and 16(D), at 10–11.

¶ 3 Meske claimed that language in the above provisions required that the UTC account be divided up by units of stock. Lang countered by claiming that the same language required the UTC account to be divided according to the account's cash value. The trial court found that the agreement alone was unclear and therefore held a hearing on the issue. After the hearing, the trial court found that the agreement required division based upon the cash value of the account and ordered Meske to pay $86,679.88 (40% of the cash value of the account minus the deductions of paragraph 16(D)). This appeal followed.

 ¶ 4 Our standard of review and the law surrounding the interpretation of property settlement agreements is well settled.

We note that our standard in reviewing the propriety of equitable distribution awards is broad: we will not disturb a trial court's determinations absent an abuse of discretion, that is, if the trial court failed to follow proper legal procedures or misapplied the law. Nor will we usurp the trial court's duty as fact-finder. *Verholek v. Verholek,* 1999 Pa.Super. 282, 741 A.2d 792 (Pa.Super.1999) (en banc), *appeal denied,* 563 Pa. 665, 759 A.2d 388 (2000). The test in any equity matter is not whether we would have reached the same result on the evidence presented, but whether the judge's conclusions can be reasonably drawn from the evidence. *Lombardo v. De Marco,* 350 Pa.Super. 490, 504 A.2d 1256, 1258 (Pa.Super.1985). Where a reading of the record can be said to reflect the conclusions reached by the lower court sitting in equity, we cannot substitute our judgment for that of the lower court. *Id.*

\* \* \* \* \* \*

The central question presented concerns the effects of the parties' agreement on the equitable distribution issues. In Pennsylvania, we enforce property settlement agreements between husband and wife in accordance with the same rules applying to contract interpretation. *Lyons v. Lyons,* 401 Pa.Super. 271, 585 A.2d 42, 45 (Pa.Super.1991). A court may construe or interpret a consent decree as it would a contract, but it has neither the power nor the authority to modify or vary the decree unless there has been fraud, accident or mistake. *Penn Township [v. Watts,* 152 Pa. Cmwlth. 359, 618 A.2d 1244, 1247 (1992)]

. . . .

It is well-established that the paramount goal of contract interpretation is to ascertain and give effect to the parties' intent. *Lyons v. Lyons, supra.* When the trier of fact has determined the intent of the parties to a contract, an appellate court will defer to that determination if it is supported by the evidence. *Id.*

When construing agreements involving clear and unambiguous terms, this Court need only examine the writing itself to

give effect to the parties understanding. *Creeks v. Creeks,* 422 Pa.Super. 432, 619 A.2d 754, 756 (Pa.Super 1993). The court must construe the contract only as written and may not modify the plain meaning of the words under the guise of interpretation. *Id.* When the terms of a written contract are clear, this Court will not rewrite it or give it a construction in conflict with the accepted and plain meaning of the language used. *Id.* Conversely, when the language is ambiguous and the intentions of the parties cannot be reasonably ascertained from the language of the writing alone, the parol evidence rule does not apply to the admission of oral testimony to show both the intent of the parties and the circumstances attending the execution of the contract. *Id.*

A contract is ambiguous if it is reasonably susceptible of different constructions and capable of being understood in more than one sense. *Walton v. Philadelphia National Bank,* 376 Pa.Super. 329, 545 A.2d 1383, 1389 (Pa.Super.1988). The court must determine as a question of law whether the contract terms are clear or ambiguous. *Id.* When acting as the trier of fact, the court also resolves relevant conflicting parol evidence as to what was intended by the ambiguous provisions, examining surrounding circumstances to ascertain the intent of the parities. *Id.*

*Osial v. Cook,* 803 A.2d 209, 213–214 (Pa.Super.2002).

¶ 5 The lower court did not abuse its discretion when it ordered a hearing after finding that as a matter of law the property settlement agreement between Meske and Lang was ambiguous. The UTC account technically contained stock (called units), not cash. Therefore, one could reasonably interpret the agreement to mean that the account would be divided by units, as Meske asserts. It is also equally reasonable to interpret the agreement to divide the account by its cash value, as Lang asserts, because the agreement indicated the cash value of the account as of June 30, 2000. Because the agreement is susceptible to different interpretations, the court properly held the hearing to determine the parties' intent.

¶ 6 Further, the lower court did not abuse its discretion when it found that the intent of the parties was to divide the account according to its cash value. Based upon both the face of the agreement and testimony obtained during the hearing, the court explained that the account should be divided according to its cash value because:

— Every other asset listed in the agreement, including retirement and investment assets similar to the retirement account in question are identified by the parties on a cash value basis;

— The second sentence of the paragraph at issue [paragraph 16(c) ] specifically sets forth the cash value of the account as "$214,873.96 as of June 30, 2000." This sentence immediately precedes language which details the percentages of distribution for each party. These two sentences, when read together, tend to reflect an intent to distribute the account on a cash basis;

— Nowhere in the paragraph at issue, or for that matter, the entire agreement does the word "unit" appear;

— We found Lang's testimony that the parties had agreed to divide the account on a cash value basis to be more consistent with the surrounding events and language of the agreements;

— Lang's former attorney corroborated her version of events and stated that she understood that the parties' intent was to have the account valued on a cash basis; [and]

— Meske testified that although all other assets in the agreement were assigned a cash value, the account in question was not, as it was too difficult to ascertain the cash value of the account. Meske made this claim despite the fact that a cash value of the account was already set forth in the agreement and despite the fact that he received account statements every three months. We found this explanation to be in contrast with the language of the contract and surrounding circumstances.

Trial Court Opinion, 1/8/04, at 7. A review of the record indicates that these conclusions were supported by the record. "Where a reading of the record can be said to reflect the conclusions reached by the lower court sitting in equity, we cannot substitute our judgment for that of the lower court." *Osial,* 803 A.2d at 213.

¶ 7 Even if the lower court found the agreement to be clear and unambiguous on its face, we would still find that the lower court did not abuse its discretion when it interpreted the four corners of the document. The lower court's findings included three separate reasons based solely on the face of the document. These three reasons (similar assets identified on a cash value basis, cash value of UTC account clearly identified in the agreement, and the word "unit" does not appear in the agreement) would be sufficient to find that the agreement required division of the account based upon the account's cash value.

¶ 8 We find that the lower court did not abuse its discretion by interpreting the agreement to divide the account on a cash value basis. Accordingly, we affirm the decision of the lower court.

¶ 9 Order AFFIRMED.