J-A27007-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| JOANN MASSENGILL | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| SKIP MASSENGILL, | : | |
| | : | |
| Appellant | : | No. 958 EDA 2018 |

Appeal from the Order Entered February 5, 2018
In the Court of Common Pleas of Montgomery County Civil Division at
No(s): 2013-10573,
PACSES #: 742113988, PACSES #:372116663

BEFORE: BOWES, J., SHOGAN, J., and STRASSBURGER, J.[*]

MEMORANDUM BY BOWES, J.: **FILED MAY 19, 2020**

Skip Massengill ("Husband") appeals from the February 5, 2018 order denying his contempt petition against his former wife, Joann ("Wife"), seeking to enforce the terms of the parties' property settlement agreement ("Agreement") regarding the calculation of his alimony obligation.[1] We vacate the order and remand for entry of an order consistent with this memorandum.

Husband and Wife married on January 13, 1990, separated in May 2013, and divorced on June 2, 2015. Three children were born of the marriage, all of whom are now emancipated. On April 16, 2015, the parties, each

---

[*] Retired Senior Judge assigned to the Superior Court.
[1] This Court previously determined that the order appealed from was a final order and remanded for a trial court opinion addressing the merits of Husband's appeal. **See** Judgment Order, 11/15/18, at 2. The trial court complied, and the parties have filed supplemental briefs addressing the trial court's opinion.

represented by counsel, entered into the Agreement, which contains provisions regarding alimony payable to Wife by Husband, the marital residence that was the subject of a foreclosure proceeding, retirement accounts, and personal property. The terms of the Agreement were expressly incorporated, but not merged, into the divorce decree.

The record reveals the following. Husband agreed to pay alimony to Wife indefinitely. He is a broker and his monthly income, including commissions, varies widely from month to month. In order to accommodate the volatility in his earnings, the Agreement contained a formula for calculating the amount of alimony due annually. If Husband's net earned income exceeded $200,000 per year, he would pay Wife $60,000 annually in alimony. Net earned income was defined in the Agreement as "Husband's gross earned income less the taxes on his income" without "any deductions for any health insurance premiums, or retirement benefits, or anything else other than taxes." N.T. 4/16/15, at 15. "If for any reason he did not pay [$60,000], he will make any additional payment he needs to make within [thirty] days of the receipt of the year-end paystub." N.T., 4/16/15, at 12. In any event, alimony was capped at $5,000 per month.

The Agreement further provided that if Husband's annual net earned income was less than $200,000, Wife would be entitled to thirty percent of

that amount. *Id*. At the end of each year, there would be a "true-up" to reconcile the amount paid to date with the amount owing or overpaid.[2]

The parties entered into a support agreement providing for the Domestic Relations Office's ("DRO") attachment of Husband's wages each month. The DRO attached Husband's earnings at the level of $5,000 per month.[3] In recognition that there could be months when Husband would not earn sufficient income to attach his wages in the full amount, and Wife would not receive any or all of the alimony payment, Wife agreed not to enforce or commence contempt proceedings as long as Husband's wages were attached and he was making payments according to the Agreement.[4] At year-end, Wife's brother, who is a tax attorney, or an agreed-upon neutral, would perform the true-up.

The Agreement further provided that Husband would retain exclusive possession of the marital residence, which was the subject of a foreclosure

---

[2] In this context, a true-up is a year-end accounting and reconciliation of alimony amounts paid by Husband with the amounts owed. The latter would be calculated by applying the formula set forth in the Agreement, which was based on Husband's annual net earned income.

[3] The record reveals that DRO does not attach wages based on a percentage of income, but only for a specific dollar amount. Hence, DRO attached Husband's wages/commissions at the flat rate of $5,000 per month, and any deficiencies were treated as arrearages. Husband appears to have been unaware of this limitation early on in the litigation.

[4] The Agreement also provided for interim catch-up provisions in the event Wife did not receive her full $5,000 in one or more months due to Husband's low earnings, but Husband's net income in successive months exceeded $17,000 per month.

proceeding. Wife agreed to sign over the deed to Husband, with the understanding that she would remain on the mortgage. Wife agreed to cooperate with Husband's mortgage foreclosure attorney, Paul Stewart, Esquire. Husband was responsible for all costs and expenses related to Mr. Stewart's representation, with one exception not relevant herein. Husband agreed to indemnify and hold Wife harmless from any deficiency judgment that could result. Wife waived any right to rent for the period of time Husband had been residing in the marital residence.

There were a number of contempt petitions filed by Husband commencing in 2015, numerous hearings were held, and most disputes were resolved.[5] However, two issues remained outstanding. At a July 19, 2017 hearing, Wife complained that Husband had not supplied her with copies of his 2015 and 2016 tax returns, and that alimony arrearages exceeded $63,586.30. Husband responded that he had provided his 2015 returns to Wife six months earlier, and that he was late for court that day because he

_____

[5] In 2016, Husband filed a contempt petition against Wife to enforce the provision in the Agreement that she would sign over the deed to the marital home to him, cooperate with the foreclosure attorney, and abstain from trespassing on the property. At the October 20, 2016 hearing on Husband's contempt petition, Wife initially refused to sign the deed because she thought it unfair that Husband had been living there for five years at no expense. N.T., 10/20/16, at 13. When the court pointed out that this fact must have been considered when the Agreement was signed, Wife maintained that she had "agreed under duress." *Id*. at 13. After the court reminded Wife that she had not filed a petition to set aside the order, and that the purpose of the proceeding was to enforce the order, Wife executed the deed and agreed to cooperate in the foreclosure.

was making copies of his 2016 tax returns for her. Husband contended that he was not in arrears on his alimony obligation. He maintained that DRO erroneously charged him at the $5,000 per month rate instead of the thirty percent level established in the Agreement for a year when his net earned income did not exceed $200,000.

It was noted that a hearing on the arrears was scheduled in August 2017. The court advised the parties that the hearings on arrears were necessitated by the true-up provision, as the issues were related and would result in adjustments on the support. However, due to the untimely exchange of documentation, the court could not resolve the issue that day. *Id*. at 11. The court advised Husband that it was in his interest to resolve the issue, and reminded him that penalties for being in arrears included incarceration.

Again, Wife voiced a complaint that Husband was living in a $1.7 million house without paying anything. The court asked Husband about the status of the foreclosure proceeding. Upon being reminded that the action was commenced in 2013, the court pointed out its continuing negative impact on Wife's credit. Husband acknowledged that, but maintained that when Wife's attorney negotiated the Agreement, "that was known at that time." *Id*. at 21.

The court speculated on the record that the parties probably did not expect that the foreclosure would take more than two years.[6] *Id*.

Husband filed another emergency contempt petition on November 17, 2016, the denial of which underlies this appeal. At a hearing on January 19, 2017, Husband explained that since DRO could not figure thirty percent of his net income, it appeared that he was always in arrears although he was not. He suggested that he be permitted to pay Wife directly to avoid this problem. The court seemingly construed this as a request by Husband to reduce his $5,000 monthly obligation for alimony by a review of the 2015 tax return. N.T. Hearing, 1/19/17, at 11.

Wife argued that she did not have enough to live on while Husband continued to reside in the former marital home, valued in excess of $1.5 million, without paying either the mortgage or the taxes. The court questioned why the foreclosure action, initiated in 2013, was still ongoing five years later, and why Husband was permitted to live in the home rent-free, with the Bank paying the taxes, a benefit calculated to be worth at least $7,300 per month

---

[6] Husband advised the court that the mortgagee's failure to proceed with the foreclosure action could be related to earlier litigation he had against mortgagee. N.T. Hearing, 7/19/17, at 29. Nonetheless, the court observed: "Well, I guess it's kind of hard for all of us sitting here to understand why it would be equitable for you to live somewhere like that -- it sounds very nice -- for three years without paying anything, and she's trying to pay a hundred and thirty dollar parking ticket, so." *Id*. at 23. Shortly thereafter, the court posited that it could arguably add $6,000 per month to Husband's income as he was living in a $6,000 per month property for free. *Id*. at 32.

to Husband. The court directed Husband to arrange for the foreclosure attorney to testify at the next hearing scheduled for February 2, 2018.

At the February hearing, Husband was represented by Attorney Richard E. Cohen, and Wife appeared *pro se*. Attorney Cohen advised the court that all issues were resolved except the true-up of the alimony obligation for 2015 and 2016. Although it had been stipulated at the January 9, 2017 hearing that Husband's net income in 2015 was between $125,000 and $130,000, Attorney Cohen informed the court that he calculated Husband's net income for 2015 as "significantly higher." N.T. Hearing, 2/2/18, at 6. Counsel represented further that the amount of the 2016 alimony should have been $22,417. *Id*. at 27. He introduced into evidence packets for both 2015 and 2016 containing calculations of Husband's pay stub to W-2 income; calculations of his gross earned income to net income for alimony purposes; calculations of alimony due; documentation of the amount paid; and, the difference in the latter two amounts. In addition, the packets contained the supporting documents, including Husband's W-2s and Pennsylvania and federal tax returns. *See* Exhibits H-2 and H-3.

Attorney Cohen represented that Husband's 2015 annual alimony obligation should be $49,027, the equivalent of a monthly amount of $4,083. N.T., 2/2/18, at 27. The court turned to Wife and asked her whether she would agree to "split the difference in half, for the sum of $4,541 per month," and she agreed. *Id*. at 34. The court concluded: "The parties agree that for

2015 the alimony to be charged to the account shall be [$]4,541 per month." *Id*. at 40.

The court prefaced the discussion of the true-up for 2016 with the statement, "We're not going to reach an agreement on '16; so I guess we need to get started." *Id*. at42. Husband's counsel was directed to proceed with testimony from the attorney handling the mortgage foreclosure action for the marital home. Attorney Paul Stewart testified that the foreclosure process was stalled, but posited that the large mortgage was the type of loan that could be cured by a loan modification, although no such modification was pending. In response to questioning, Mr. Stewart stated that the parties' defense to the foreclosure action was that the loan was paid. *Id*. at 61. The court asked, "What prevents me from imputing income since he's indicating that this [loan] may not even be paid back?" *Id*. at 62. Counsel for Husband responded that loan forgiveness is not earned income, to which the court countered that it was not bound by that restriction when there was an enforcement or interpretation issue. *Id*.

Husband established that he paid $22,417 in alimony in 2016, and maintained that no more was due under the formula in the Agreement. However, in order to resolve matters that day, Husband agreed to add an additional amount equal to thirty percent of the mortgage, taxes, and homeowner's insurance into his income for purposes of computing alimony. He would pay $4,058 per month for 2016, for a total of $48,696 for 2016,

"without prejudice to any claims or arguments or rights he has that the mortgage should not be considered -- it's not earned income." ***Id***. at 110.

The court turned to Wife and asked, "Are you in agreement to accept for 2016 the sum of $4,058 a month as opposed to what you believe the amount should be assuming that you're at the $5,000 number?" ***Id***. at 116. Wife responded, "Yes, but, Your Honor, I'm confused. My intent is to get – that he should not be in that house any more. Does this effect [sic] the foreclosure?" ***Id***. The court clarified, "No. We're talking about the payments." ***Id***. Wife replied "Okay. That's fine." The court verified, "So you'll accept that [$]4,058 for 2016 per month?" Wife replied "Yes." ***Id***.

Following that exchange, the court asked whether 2017's alimony could be resolved. Counsel for Husband advised that court that they could not yet calculate alimony for 2017. There was a proffer of testimony from Mr. Stewart regarding the knowledge of Wife's counsel of the mortgage and the defense of the foreclosure action when the Agreement was negotiated, but the court declined to hear such testimony.

At the conclusion of the hearing, the court entered its order on the record. It ruled that, "Husband's request for a reduction in his alimony obligation pursuant to Section 8 of the Property Settlement Agreement is denied." ***Id***. at 127. Husband was directed to pay $5,000 for February 2018 directly to Wife by close of business on February 6, 2018, or be held in contempt. ***Id***. Husband was ordered to pay $5,000 to DRO commencing

March 1, 2018, and every month thereafter, and to pay remaining alimony arrears, with an offset for child support Wife owed, on or before April 2, 2018. *Id*.at 128. The court stated it would secure at Husband's expense a realtor for purposes of obtaining a monthly rental value to the former marital residence, with the goal of renting it out by May 1, 2018. *Id*. The court re-listed the matter for April 3, 2018. When counsel for Husband asked the court to note that it was imputing income from Husband's non-payment of the mortgage and taxes in calculating the $5,000 per month alimony, the Court replied that it did not need to do that as Husband was living there for free, his girlfriend with a $200,000 annual income had been living there for at least eight months for free, and with their combined income of $330,000, "no one was paying anything." *Id*. at 130. The order was reduced to writing in an order dated February 2, 2018, which unambiguously provided that "Husband's alimony obligation, effective January 1, 2016, remains the amount of Five Thousand Dollars ($5,000) per month, as set forth in Section 8 of the aforementioned Agreement." Order, 2/2/18, at 1.

Husband filed a motion for reconsideration, which was denied on February 21, 2018. Husband timely appealed and complied with the trial court's order to file a Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal. Thereafter, Husband filed a motion for stay pending appeal. The trial court held a hearing on May 24, 2018, following which it granted the request to stay proceedings regarding the appraisal for purposes

of ascertaining the rental value of the former marital home and the collection of approximately $50,000 that it believed were the arrearages for 2016. The trial court then issued a Rule 1925(a) opinion in which it maintained that the appeal was interlocutory.

By judgment order of November 15, 2018, this Court concluded that the 2016 alimony obligation was final, and directed the trial court to file a supplemental opinion. The trial court complied on February 13, 2019, and both Husband and Wife filed supplemental briefs addressing the trial court's supplemental opinion. The following issues are before us:

> [1.] Did the trial court misapply the formula for calculation of spousal support obligation in the non-modifiable consent divorce decree and order signed May 29, 2015 and docketed June 2, 2015 ("Divorce Decree and Order") for 2015 and 2016?
>
> [2.] Did the trial court contradict the Divorce Decree and Order in attempting to assign a rental value to [Husband's] occupation of the marital home as agreed and as part of the Divorce Decree and Order?
>
> [3.] Alternatively, [did the parties reach] a settlement of the 2016 alimony obligation?

Husband's brief at 5-6; Husband's supplemental brief, at i (unnecessary capitalization omitted).

Preliminarily, we agree with Husband that the certified record does not support the trial court's characterization of his petition as one seeking to reduce his alimony obligation. *Cf. Stamerro v. Stamerro*, 889 A.2d 1251, (Pa.Super. 2005) (denying husband's petition to modify his contractual alimony obligation to his former wife). Rather, Husband sought to enforce the

Agreement as written, and maintained that the Agreement mandated a true-up annually. He contended that the arrearages calculated by DRO did not accurately reflect his alimony obligation since DRO could not calculate a percentage of his net earned income as alimony because it works strictly on a monthly dollar amount. Thus, the amount payable each month was deemed to be $5,000, and, to the extent Husband's income did not permit such a payment, the shortfall was designated as an arrearage. He calls the arrearages "fictitious" as they do not necessarily represent actual amounts in arrears when his net earned income is less than $200,000. At year-end, the true-up was to be performed to reconcile the amount due and the amount paid. Husband's petition sought to force the true-up of his alimony obligations for 2015 and 2016.

Husband also challenges the trial court's calculation of his alimony obligations for 2016. He contends that the court ignored the formula set forth in the Agreement and improperly imputed to him the rental value of the marital home in calculating alimony payable at the rate of $5,000 per month. Husband maintains further that the court's order that he vacate the marital home so that it could be rented violates the Agreement. In the alternative, Husband claims that the parties reached a settlement of 2016 alimony, and that the trial court ignored that settlement when it ordered him to pay $5,000 per month in alimony despite earned income less than $200,000 in 2016.

It is well settled Pennsylvania law that property settlement agreements are contracts to be construed pursuant to our rules governing contract

interpretation generally. *In re Estate of Easterday*, 209 A.3d 331, 346 (Pa. 2019) (citing *Kripp v. Kripp*, 849 A.2d 1159, 1163 (Pa. 2004)). When interpreting such an agreement, "the trial court is the sole determiner of facts and absent an abuse of discretion, we will not usurp the trial court's fact-finding function." *Rosiecki v. Rosiecki*, 2020 PA Super 92 (Pa.Super. 2020) (quoting *Stamerro, supra* at 1258).

On appeal from an order interpreting a marital settlement agreement, appellate courts are charged with deciding whether the trial court committed an error of law or abused its discretion. *Tuthill v. Tuthill*, 763 A.2d 417, 419 (Pa.Super. 2000) (*en banc*). Since contract interpretation is a legal question, we are not bound by the trial court's interpretation. *Kripp*, *supra* at 1164 n.5. As is the case generally with questions of law, our standard of review is *de novo* and our scope of review is plenary. *Stamerro*, *supra*, at 1257-1258.

In interpreting contracts, "the paramount goal . . . is to ascertain and give effect to the parties' intent." *Lang v. Meske*, 850 A.2d 737, 739 (Pa.Super. 2004). The intent of the parties to a written agreement is to be regarded as being embodied in the writing itself. Courts look at the whole instrument in arriving at contractual intent. *Murphy v. Duquesne University of the Holy Ghost*, 777 A.2d 418, 429 (Pa. 2001). We do not assume that the language was chosen carelessly, or that the parties did not understand the language used. "When a writing is clear and unequivocal, its meaning must be determined by its contents alone." *Id*. at 429. The trial court "has neither the power nor the authority to modify or vary the decree

- 13 -

unless there has been fraud, accident, or mistake". ***Bianchi v. Bianchi***, 859 A.2d 511, 515 (Pa.Super. 2004) (cleaned up).

Husband contends that the trial court erred when it interpreted the Agreement as mandating alimony in the amount of $5,000 per month regardless of his monthly net earned income. Furthermore, he maintains, the court erroneously refused to be bound by the Agreement's unambiguous definition of income as "net earned income," which reflects the intention of the parties. Husband directs our attention to the section of the Divorce Code, 23 Pa.C.S. § 3701(f), which provides that parties may contract or expand statutory rights, and "[w]henever the court approves an agreement for the payment of alimony voluntarily entered into between the parties, the agreement shall constitute the order of the court and may be enforced as provided in section 3703." Husband's supplemental brief at 9. Husband argues that the court, contrary to its own statement of the law that property settlement agreements are contracts and to be construed as contracts, rewrote unambiguous terms to mirror those in the Divorce Code and favor Wife.

The trial court maintains that it acted within its discretion in directing Husband to pay $5,000 per month in alimony to Wife for 2016. It acknowledges that, in doing so, it refused to enforce the Agreement's definition of "income" as net earned income, but insisted that such a definition "clearly contradicts the statutory language and intent of the Divorce Code." Trial Court Opinion, 2/13/19, at 11. In support of its position, the court

pointed to the statutory factors enumerated in 23 Pa.C.S. § 3701(b), for determining whether alimony should be awarded. It also adopted the definition of income set forth in § 4302, and concluded that the legislature did not intend to alter the rationale used by a court to determine income for purposes of alimony. Such income, the court maintained, includes commissions, rents, and gains from dealings in property.

Husband counters that the factors a court must consider when determining whether alimony should be awarded have no bearing on the issues here. The parties agreed to alimony, the amount, and the duration. The issue is calculating how much alimony per year, and the Agreement contains the formula. Moreover, the parties are free to define income as they choose in their Agreement, and are not bound by the Divorce Code definition.

Wife concedes that income for purposes of calculating alimony was defined in the Agreement as Husband's gross earned income minus taxes. **See** Wife's Brief at 1. Nonetheless, she argues that since the Agreement is silent as to Husband continuing to live in the former marital home without paying a mortgage, rent, or taxes, the language in the Divorce Code defining income as "gains derived from dealing in property, rents" and "income from discharge of indebtedness" should control. **Id**. We disagree.

Upon review, we conclude that the trial court's determination of the parties' intent is not supported by the unambiguous language in the Agreement. Neither Wife nor the trial court suggests that the Agreement's formula and procedure for the calculation of alimony is ambiguous, nor do we

find it so. Husband's income for purposes of calculating the amount of alimony was defined as his net earned income, consisting of gross earnings minus taxes. The trial court admittedly ignored the contractual language and the formula for determining the amount of alimony and expanded Husband's "income" to include the rental value of the home in which Husband resided at no expense as income.

The Divorce Code does not trump the agreement of the parties. The parties were free to agree to consider only Husband's net earned income in calculating the amount of alimony. That Agreement, incorporated into the divorce decree, has the effect of a court order. Accordingly, we find that any benefit to Husband from living in the marital residence expense-free is not income to Husband for purposes of calculating alimony, and the court erred in considering it in ordering the amount of alimony due to Wife. Nor could the court order Husband to vacate and lease out the marital home in order to realize rental income that the court would then treat as income to Husband for purposes of calculating alimony.[7]

_____

[7] Our decision regarding the trial court's treatment of the former marital residence is limited solely to its impact on the amount of alimony payable to Wife. Although Wife has repeatedly argued that it is unfair that Husband has been permitted to live for years expense- free in a home valued in excess of $1.5 million, perhaps as much as $1.7 million, Wife did not seek to set aside the Agreement as contrary to the parties' intent in this regard. Furthermore, it is unclear from the record what Wife knew when she agreed to deed over the marital home to Husband in return for indemnity on any deficiency judgment in foreclosure.

- 16 -

We find further that the Agreement contemplated that the parties would enter a support agreement providing for alimony to be attached from Husband's wages/commissions in the amount of $5,000 per month. We view this as a preliminary allocation of alimony subject to correction when a true-up was performed at year-end when Husband's annual income was finally determined. If Husband did not earn enough in a particular month to permit a $5,000 payment, the balance would be treated by DRO as arrearages. At the end of the year, Husband's actual annual net earned income would be calculated. If it totaled $200,000 or more, Husband would be responsible for $60,000 in total alimony. If he had not paid that amount, he would be obligated to pay Wife the balance. If Husband's income did not meet or exceed $200,000, he was responsible for alimony based on thirty percent of the net earned income. The true-up at the end of the year was intended to determine if Husband owed additional alimony, or whether he had overpaid, and settle any arrearages.

The trial court understandably was averse to performing the true-up procedure that the parties agreed would be performed by Wife's brother or a neutral party satisfactory to both. However, Husband submitted calculations based on his net earned income that Wife did not challenge. The court's disregard of the agreed-upon formula, in favor of ordering Husband to pay the $5,000 maximum under the Agreement every month, impermissibly negated the terms of the Agreement.

For the foregoing reasons, we find that the trial court erred in overriding the parties' Agreement regarding the calculation and payment of alimony. The alimony provision in the Agreement is unambiguous and enforceable as written. The value to Husband from residing in the marital home without paying the mortgage, taxes, and insurance on that property is not earned income as defined in the Agreement, and was improperly considered by the trial court in calculating alimony for 2016.

There is no dispute that the parties reached a settlement with regard to the amount of alimony payable in 2015. Moreover, we agree with Husband that, despite the clear evidence of offer and acceptance, the trial court ignored the on-the-record settlement of 2016 alimony at $4,058 per month and instead ordered Husband to pay the sum of $5,000 per month commencing January 1, 2016. We remand for entry of an order confirming the settlement of 2016 alimony at $48,696.

Upon remand, DRO's attachment of Husband's wages at the rate of $5,000 per month shall continue per the parties' support agreement. To the extent Husband's income is insufficient to attach the full monthly amount, the deficiency shall be noted by DRO as an arrearage. However, once the true-up is performed at year-end and Husband pays any amounts that may be owing, Wife should provide a stipulation to DRO that the arrearages have been paid. Going forward, either the parties will agree on a neutral third-party to perform the true-up at the end of the calendar year pursuant to the

Agreement, or the court may appoint a knowledgeable professional to perform the service with the expense to be borne equally by the parties.

Accordingly, we vacate the court's February 2, 2018 order in its entirety, and remand for entry of a new order confirming the 2016 settlement amount for alimony. Upon satisfaction of any amounts owing, 2016 arrearages shall be erased. In addition, we direct the trial court to enforce the alimony provision in the Agreement as written, *i.e.*, based on Husband's net earned income, which does not include income imputed from his expense-free living arrangement in the former marital home or rental income.

Order vacated. Case remanded for further proceedings. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 5/19/2020